

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————————

No. 02-21-00164-CR

———————————————————

JAY RILEY DOMINGUEZ, Appellant

V.

THE STATE OF TEXAS

_____

On Appeal from the 415th District Court
Parker County, Texas
Trial Court No. CR19-1139

_____

Before Sudderth, C.J.; Kerr and Wallach, JJ.
Opinion by Justice Wallach

# OPINION

A jury convicted Appellant Jay Riley Dominguez of aggravated assault of a police officer and assessed punishment at thirty years' confinement, and the trial court sentenced him accordingly. In two issues, Appellant contends that insufficient evidence supports the jury's finding that he used or exhibited a deadly weapon during the assault and that the trial court erred by refusing to permit one of his witnesses to testify remotely via video conferencing software. Because the evidence supports the jury's verdict and because Appellant did not show harm from the exclusion of the witness's testimony, we will affirm.

## Background

We include here only a brief summary of the background facts because we more fully examine the trial evidence in addressing Appellant's evidentiary sufficiency challenge. Weatherford police officers Christopher Bumpas and Preston Harper went to the home of Appellant's ex-girlfriend in response to a 911 call requesting a welfare check because of Appellant's presence there;[1] the officers were aware that Appellant had an outstanding warrant for his arrest. When the officers approached Appellant, he tried to flee on foot, but Bumpas quickly tackled him, with Appellant landing on his stomach with his arms underneath him. While the two officers were attempting to

---

[1]The ex-girlfriend had obtained an ex parte protective order against Appellant, and when he showed up at her home, her children called their grandmother, who called 911. The State conceded in the trial court that Appellant did not know about the order.

pull his arms out from under him to handcuff him, Appellant flailed about, announced that he had a gun, and put his hand on the butt of the gun. Bumpas managed to get the gun from Appellant's hands, but in the altercation, Bumpas's nose was broken, and his knee was sprained.

Appellant was charged by indictment with aggravated assault. The indictment alleged that Appellant caused bodily injury to Bumpas, a police officer discharging his official duty, and that Appellant used or exhibited a firearm during the commission of the offense. *See* Tex. Penal Code Ann. §§ 22.01, 22.02(a)(2), (b)(2). The jury found him guilty, and Appellant now appeals.[2]

## Discussion

### I. Legal sufficiency

In Appellant's first issue, he argues that the evidence was legally insufficient to establish that he used or exhibited a deadly weapon. To prove the offense of aggravated assault of a public servant as alleged in the indictment, the State had to prove that Appellant intentionally, knowingly, or recklessly caused bodily injury to Bumpas while Bumpas was lawfully discharging an official duty and that Appellant used or exhibited a deadly weapon during the commission of the assault. *See id.* §§ 22.01(a)(1), 22.02(a), (b). Appellant does not dispute that he possessed a firearm

_____

[2]Appellant was also convicted of resisting arrest or search with a deadly weapon. *See* Tex. Penal Code Ann. § 38.03. For that offense, he was sentenced to ten years' confinement, running concurrently with the sentence for this offense. Appellant does not challenge that judgment on appeal.

3

during the assault or that the firearm qualifies as a deadly weapon, *see id.* § 1.07(a)(17), but he argues that the evidence does not show that he used or exhibited it.

### A. Standard of review

In our evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The factfinder alone judges the evidence's weight and credibility. *See* Tex. Code Crim. Proc. Ann. art. 38.04; *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021). We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's. *Queeman*, 520 S.W.3d at 622. Instead, we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict. *Braughton v. State*, 569 S.W.3d 592, 608 (Tex. Crim. App. 2018); *see Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy but must consider the cumulative force of all the evidence."). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution. *Braughton*, 569 S.W.3d at 608.

**B. Proving a deadly weapon's use or exhibition**

The Texas Penal Code does not define "use" or "exhibit," but the Court of Criminal Appeals has applied dictionary definitions to define the terms, holding that "use" of a deadly weapon requires that the deadly weapon to be "utilized, employed, or applied in order to achieve its intended result," but that "exhibit" requires only "that a deadly weapon be consciously shown, displayed, or presented to be viewed" during the offense. *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim. App. 1989) (quoting former Tex. Code Crim. Proc. Ann. Art. 42.12, § 3g(a)(2)). Merriam-Webster's dictionary further defines "show" to mean, among other things, "to cause or permit to be seen" and "to reveal by one's condition, nature, or behavior," and it defines display to mean "to put or spread before the view" or "to make evident." *See* Show, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/show; Display, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/display; *see also Searcy v. State*, 115 S.W.3d 628, 631 (Tex. App.—Waco 2003, no pet.) (relying on Merriam–Webster's Collegiate Dictionary to define "show" and "display").

Based on these definitions, the Court of Criminal Appeals has construed "used or exhibited" broadly to include any employment of a deadly weapon if it facilitates the associated felony or its use, in itself, fulfills an element of the offense on trial. *Whatley v. State*, 946 S.W.2d 73, 76 (Tex. Crim. App. 1997) (citing *Tyra v. State*, 897 S.W.2d 796, 797 (Tex. Crim. App. 1995), and *Patterson*, 769 S.W.2d at 941).

5

Mere possession is generally not enough; "[t]he deadly weapon must, in some manner, help facilitate the commission of the felony." *Plummer v. State*, 410 S.W.3d 855, 865 (Tex. Crim. App. 2013). However, "[i]n the context of violent offenses, the term 'exhibit' contains an implicit element of facilitation" because if one exhibits a deadly weapon "without overtly using it to harm or threaten while committing a felony, the deadly weapon still provides intimidation value that assists the commission of the felony." *Id.* at 862.

### C. Analysis

Appellant argues that the gun in his possession "did nothing to facilitate the commission of the assault." He contends that there was no evidence that he reached for his gun, that the evidence was that his hands were pinned to the ground, that his hand could have been pressed on the gun by Bumpas's tackle "and the struggle that ensued," and that "[t]he speculation that he wanted to 'use' or 'exhibit' the gun . . . is not supported by the evidence." We disagree with his characterization of the evidence.

When Bumpas and Harper arrived at Appellant's ex-girlfriend house, they saw Appellant and his ex-girlfriend outside. The officers knew Appellant had an outstanding arrest warrant, which they mistakenly believed to be a misdemeanor warrant. They later found out that it was actually a felony warrant.

The officers approached Appellant, both wearing their uniforms. Bumpas's bodycam recorded him saying to Appellant, "Hey, Jay, come here. Are you Jay? Come here." Appellant responded "No. . . . I'm not—what—," and then attempted to flee.

6

Bumpas almost immediately tackled Appellant in a bear hug, knocking off his bodycam in the process. Appellant landed on his stomach, with both his and Bumpas's hands under Appellant's body.

Appellant was much larger than Bumpas—Bumpas testified that he is 5'6" tall and that Appellant is "over six feet" tall—and Bumpas could not control Appellant's arms or stop Appellant from moving around. Appellant was "kicking with his feet on the ground trying to get back up" and "flailing a lot" with his elbows and head, and Appellant managed to move his body enough so that "his body turned back towards the east but [Bumpas] was still facing towards the west." Bumpas still had his hands under Appellant's body and was trying to pull Appellant's left arm out from underneath him so the officers could handcuff him. Harper was able to pull Appellant's right arm out from underneath his body, but he did so against Appellant's resistance. He had to strike Appellant in the back four or five times to dislodge the arm.

Bumpas testified that "[a]t first [he] was just yelling [to Appellant], give me your hand, give me your hand" while trying to keep Appellant's flailing arms down. That changed when Appellant told the officers that he had a gun. Bumpas's bodycam had fallen close enough to record Appellant say, "I got a gun, I got a gun, I got a gun. I don't wanna fucking do this." Although before then Bumpas had been attempting to get Appellant's left arm out from under Appellant's body, he testified that at that point he "ke[pt] his body weight on [Appellant] as much as [he could] just to make

7

sure [Appellant's] arms *didn't* come out from under him." [Emphasis added.] With his arm still under Appellant, Bumpas felt Appellant's hands on the butt of a pistol, holding it "in a way he could shoot" it. Bumpas told Harper, "He does have a gun—he's got a gun. Shoot him in the fucking head!" Bumpas explained that he told Harper to shoot because he "knew that if [Appellant] was able to get his arm out from under him with that gun [they] were both in trouble[;] there's no telling what would happen." Bumpas said, "I remember thinking that one of us was going to get shot if the gun comes out of his waistband."

Harper responded, "Dude, are you sure?" As soon as Harper said that, however, Appellant's arm "came out a little bit," and Bumpas was able to twist the gun away from Appellant's hand and fling it a few feet away. Bumpas told Harper, "I got it, I got it, I got it." He then managed to take control of Appellant's arm enough that the officers were able apply handcuffs, although Appellant continued to fight against them. Bumpas testified that the firearm that he had pulled from Appellant's hand was a loaded Ruger LCP semiautomatic pistol.

While the officers handcuffed Appellant, he told them to shoot him, that they were "gonna have to [shoot him] in the end," and that he "didn't do anything violent until this." Appellant also informed the officers that he had another firearm—which Bumpas identified at trial as a Taurus revolver—in his boot. While Bumpas and Harper waited for other police officers to arrive, Appellant said that he had grabbed the Ruger because he was trying to "unarm" himself. When Bumpas said, "I had to

8

wrench it out of your hand, bro," Appellant replied that he had not aimed the gun at anyone.

Bumpas told the jury that during the altercation, he sprained his knee and his nose was broken and that he believed that his nose had been broken by Appellant's elbow or head. Bumpas denied that the injuries could have happened when he tackled Appellant.

In summary, the jury heard evidence from which it could find that the pistol was related to and facilitated the assault. Rather than submit to having his arm brought out from underneath him and put in handcuffs, Appellant announced that he had a gun, flailed against Bumpas violently enough to injure Bumpas's nose and knee, and grabbed the gun. The jury also heard evidence that Bumpas, with his arm under Appellant, felt the gun and feared that Appellant would shoot him or Harper. Bumpas further testified that when he felt Appellant's hand on the gun, rather than continuing to try to get Appellant's arm out to handcuff him (and thereby end the assault against him), Bumpas had to focus on getting the gun away from Appellant and use his body weight to keep Appellant's arm underneath him. The jury thus had evidence that Appellant's announcing that he had a gun and then grabbing it prolonged the period in which Appellant was able to flail his body against Bumpas because Bumpas had to focus on controlling the gun rather than handcuffing Appellant. Bumpas also testified that the assault occurred during that altercation. From this evidence, a rational fact finder could have found beyond a reasonable doubt that Appellant used or exhibited

9

the gun during the assault. *See Whatley*, 946 S.W.2d at 76; *Jeffery v. State*, No. 08-01-00060-CR, 2002 WL 1397141, at *4 (Tex. App.—El Paso June 27, 2002, no pet.) (not designated for publication) (holding evidence sufficient to support finding that gun was exhibited during assault, despite complainant's not seeing gun in the dark room, when complainant testified that she felt the gun and she and defendant struggled over it); *but cf. Plummer*, 410 S.W.3d at 862, 865 (holding handgun was not used or exhibited during possession-of-body-armor offense because the gun did not play any role in enabling, continuing, or enhancing the offense).

Appellant argues that the jury could only speculate that he intentionally put his hand on his gun, and that it is just as likely that his hand fell on the gun when he was tackled. However, the jury heard evidence that Harper had to strike Appellant multiple times to get control of Appellant's right arm; that Appellant was flailing so hard against Bumpas that he broke Bumpas's nose; and that while committing that assault, Appellant not only announced that he had a gun but followed that announcement by saying that he "d[id]n't wanna fucking do this."[3] The inference that Appellant placed his hand on the gun was not unreasonable given the evidence.

---

[3]Additionally, in the bodycam footage played for the jury, one of the officers stated that Appellant had pulled a gun on them, to which Appellant replied that had been trying to "unarm [him]self," which the jury could interpret as an acknowledgment by Appellant that he had put his hand on the weapon.

Appellant argues that the case is like *Griffith v. State*, an unpublished opinion[4] in which the Court of Criminal Appeals held that the evidence was insufficient to support the defendant's conviction for continuous sexual assault of child. *See* No. PD-0639-18, 2019 WL 1486926, at *1 (Tex. Crim. App. Apr. 3, 2019) (not designated for publication). That case is readily distinguishable because it did not involve the use or exhibition of a deadly weapon. *Id.* Further, in that case the State relied in part on the complainant's mother's testimony to prove the alleged continuous sexual assault, and the court held that for the State's characterization of the mother's testimony to be true, the jury would have had to believe that what the mother said was not what she actually meant. *Id.* at *4. The court further noted that some of the evidence that could have supported the State's theory was not presented to the jury, and "[a] jury cannot make inferences based on evidence that they never heard." *Id.* at *5. Here, the jury could have drawn reasonable, permissive inferences based on the evidence actually presented, taking Bumpas's and Harper's testimony—supplemented with the bodycam footage—to mean what they said. We overrule Appellant's first issue.

## II. Zoom witness

In Appellant's second issue, he contends that the trial court erred by not allowing one of Appellant's witnesses at punishment to appear by Zoom, as required by the governor's Twenty-Sixth Emergency Order under Texas Government Code

---

[4]*See* Tex. R. App. P. 77.3 (providing that unpublished opinions from Court of Criminal Appeals have no precedential value and must not be cited as authority).

Section 22.0035. *See* Tex. Gov't Code Ann. § 22.0035(b); *Twenty-Sixth Emergency Order Regarding COVID-19 State of Disaster*, 609 S.W.3d 135 (Tex. 2020). At punishment, Appellant's attorney informed the trial court, "We did want to put one other witness thing on the record, Your Honor. [Appellant's] ex-wife[ ] is not here, but she would have been willing to testify via Zoom. The State is opposed to that. Are you opposed to that?" The court answered, "Yes," and Appellant's attorney then stated, "Okay. We'd like to put it on the record that we asked." The trial court confirmed that the request had been denied, and the State and defense both rested.

Appellant's attorney did not make an offer of proof to show the substance of the witness's testimony. *See Holmes v. State*, 323 S.W.3d 163, 168 (Tex. Crim. App. 2009) (stating that an offer of proof is necessary to show error or harm from the exclusion of evidence unless the substance is apparent from the context). We thus have no record of what Appellant's ex-wife would have said in her testimony, and the substance of her testimony is not apparent from the context. Accordingly, even if we concluded that not allowing the witness to appear by Zoom was erroneous, we could not determine whether that error was harmful. *See* Tex. R. App. P. 44.2 (stating that non-constitutional error must be disregarded if it does not affect a party's substantial rights); *Holmes*, 323 S.W.3d at 168; *cf. Ferguson v. State*, 97 S.W.3d 293, 297 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (stating appellant failed to show harm from trial court's limiting of cross-examination when counsel made no offer of proof detailing the questions he wanted to ask).

Appellant asserts that no bill of exceptions was made or requested "presumably because the bill would have had to have been made over Zoom, which the State objected to, and the trial court refused to allow." However, questioning the witness was not the only option for making an offer of proof. Appellant's attorney could have made a concise statement that included "a reasonably specific summary of the evidence offered" and stated the relevance of the evidence. *See Holmes*, 323 S.W.3d at 168 (quoting *Warner v. State*, 969 S.W.2d 1, 2 (Tex. Crim. App. 1998)). Because Appellant did not show harm, we overrule his second issue. *See* Tex. R. App. P. 44.2; *Holmes*, 323 S.W.3d at 168; *cf.* Tex. R. Evid. 103(a)(2); *Hawk v. State*, No. 11-20-00140-CR, 2022 WL 1179366, at *5 (Tex. App.—Eastland Apr. 21, 2022, no pet.) (mem. op., not designated for publication) (holding appellant failed to preserve complaint that witness had been improperly excluded for violating the Rule).

## Conclusion

Having overruled Appellant's two issues, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Publish

Delivered: September 15, 2022

13